1  Jeffrey N. Williams (SBN 274008)
   jwilliams@wargofrench.com
2  WARGO & FRENCH LLP
3  1888 Century Park East, Suite 1520
   Los Angeles, CA  90067
4  Telephone: 310-853-6300
   Facsimile: 310-853-6333
5
6  J. Scott Carr (SBN 136706)
   scarr@wargofrench.com
7  WARGO & FRENCH LLP
   999 Peachtree Street, N.E., 26th Floor
8  Atlanta, GA 30309
   Telephone: 404-853-1500
9  Facsimile: 404-853-1501

10 Attorneys for Defendants TWC Administration LLC, Time Warner Cable Inc., and
11 Time Warner NY Cable LLC

12              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
13

| 14  DAISY VASQUEZ, an individual and on behalf of all others similarly situated; BRYAN JOSEPH, an individual and on behalf of all others similarly situated | Case No. CV14-7621-CAS (FFMx) |
|---|---|

14 DAISY VASQUEZ, an individual and on
   behalf of all others similarly situated;
15 BRYAN JOSEPH, an individual and on
   behalf of all others similarly situated
16
17              Plaintiffs,
18        v.
19 TWC ADMINISTRATION LLC, a
   Delaware limited liability company; TIME
20 WARNER CABLE INC., a Delaware
   Corporation; TIME WARNER NY
21 CABLE LLC,  a limited liability company
22 and DOES 1 to 50, inclusive,
23              Defendants.
24
25
26
27
28

Case No. CV14-7621-CAS (FFMx)

**DEFENDANTS' NOTICE OF
MOTION AND MOTION FOR
SUMMARY JUDGMENT OR, IN
THE ALTERNATIVE, PARTIAL
SUMMARY JUDGMENT;
MEMO. OF POINTS AND
AUTHORITIES IN SUPPORT**

Date: May 4, 2015
Time: 10:00 a.m.
Courtroom: 5

[Statement of Uncontroverted Facts
and Conclusions of Law, Request for
Judicial Notice, and Declarations of
Natisha Carn, Lorena Abel, and J.
Scott Carr filed concurrently
herewith]

[Proposed Order lodged concurrently
herewith]

Hon. Christina A. Snyder

---

**TO THE HONORABLE COURT, ALL PARTIES AND THEIR**

**ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on May 4, 2015, at 10:00 a.m., in Courtroom 5 of the United States District Court for the Central District of California, located at 312 North Spring Street Los Angeles, CA 90012-4701, Defendants TWC Administration LLC ("TWCA"), Time Warner Cable Inc. ("TWCI"), and Time Warner NY Cable LLC ("TNY") (collectively "TWC" or "Defendants"), will and hereby do move the Court for summary judgment, or in the alternative, for partial summary judgment against Plaintiffs Daisy Vazquez[1] and Bryan Joseph ("Plaintiffs") pursuant to Rule 56 of the Federal Rules of Civil Procedure.

This Motion is made on the ground that the three theories of relief underlying Plaintiffs' operative Second Amended Class Action Complaint ("SAC") [D.E. #23] are meritless and fail as a matter of law.  Specifically, Plaintiffs have alleged two overtime theories.  Plaintiffs' first overtime theory, their "hours worked" theory, alleges that TWC undercalculated their overtime pay by considering vacation, holiday, and personal hours as "hours worked."  Plaintiffs' second overtime theory, their "fiscal month" theory, contends that rather than calculating their additional overtime resulting from their commission and "scorecard" payments on a workweek basis, TWC was instead required to calculate that overtime on a fiscal month basis that matched the fiscal month pay cycle for these payments.  Both of Plaintiffs' overtime theories fail because TWC's calculation methodologies are consistent with both the plain language and spirit of the law, and were not designed to underpay employees.  In fact, TWC's calculations benefit employees, and even if Plaintiffs' theories had any legal merit—they do not—the undisputed facts nevertheless demonstrate that TWC paid both Plaintiffs vastly *more* than they would have been paid pursuant to the methodologies they have themselves proposed in this lawsuit.

---

[1] Plaintiff Daisy Vazquez's last name is misspelled in the caption.

**DEFS.' NTC OF MTN AND MTN FOR SUMMARY JUDGMENT**

1   Thus, given that Plaintiff were not underpaid or damaged by TWC's purported

2   calculations, no liability can attach under either federal or California law, and

3   moreover, Plaintiffs entirely lack Article III constitutional standing to assert their

4   overtime claims against TWC.

5        Plaintiffs' third theory, their "piece-rate" theory, has nothing to do with

6   overtime but instead alleges that TWC violated California Labor Code Section 226(a)

7   by mischaracterizing Plaintiffs' commissions as commission payments (not required

8   to be itemized on the wage statement), rather than piece-rate payments (required to be

9   itemized on the wage statement).  This theory fails, however, because the payments in

10  question were in fact sales commissions as a matter of law, and therefore did not need

11  to be itemized on Plaintiffs' wage statements as piece-rate payments would.

12       Finally, Plaintiffs assert claims under California law for wage statement and

13  waiting time penalties that are entirely derivative of their "hours worked" and "fiscal

14  month" overtime theories, and which therefore fail for the same reasons as those

15  meritless theories.  These derivative claims also fail as a matter of law because there

16  is a good faith dispute as to whether TWC owes Plaintiffs any additional wages.

17  Plaintiffs' derivative wage statement claim fails for the additional reason that

18  Plaintiffs' wage statements were, in fact, accurate.  Indeed, Plaintiffs contend that

19  instead of being provided with accurate wage statements reflecting the amounts they

20  were actually paid (as they acknowledge was the case), they should have been

21  provided with *in*accurate wage statements reflecting the additional overtime they

22  contend they ***should have been****,* but were not, actually paid.  This theory of relief

23  turns the intent of the wage statement statute on its head and is nothing more than a

24  transparent attempt to obtain an impermissible multiple recovery on the underlying

25  overtime claims.  Thus, Plaintiffs' derivative claims lack any merit whatsoever.

26       This Motion follows the conference of counsel pursuant to L.R. 7-3 on March

27  16, 2015.  The parties have conferred extensively on this Motion, as well as TWC's

28  previously-filed motion to bifurcate [D.E. #28], having exchanged views on these

1   issues on March 16, March 19, March 24 and March 26-27, 2015.  On March 19, after

2   having reviewed a March 16 e-mail from TWC containing the grounds for both

3   motions, Plaintiffs' counsel sent an e-mail in which they stated they would oppose

4   both motions.  This exhausted TWC's L.R. 7-3 obligations, as it was clear that there

5   was to be no agreement on either motion.  However, in that same e-mail, Plaintiffs'

6   counsel inexplicably continued to demand a further telephone conference.  On March

7   24, the parties conferred again and, as Plaintiffs' counsel made clear on March 19,

8   they refused to agree to any of the issues raised in either motion.

9       Subsequently, Plaintiffs' counsel emailed TWC's counsel threatening to seek

10   *ex parte* relief to: (1) advance the hearing date on their motion to compel certain

11   classwide discovery; and (2) postpone the hearing date of TWC's Motion for

12   summary judgment to permit Plaintiffs to simultaneously litigate their own cross-

13   motion for summary judgment.  TWC responded the same day, offering (again) to

14   agree to a briefing schedule for cross-motions for summary judgment, subject to a

15   bifurcated schedule that eliminated Plaintiffs' stated basis for *ex parte* relief.

16   Plaintiffs again refused to agree to any sort of compromise.  Nevertheless, TWC

17   elected to delay its filing of its summary judgment motion to April 6, 2015, giving

18   Plaintiffs the opportunity to file their cross-motion the same day.

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

This Motion is based upon this Notice of Motion and Motion for Summary Judgment, the attached Memorandum of Points and Authorities, Statement of Uncontroverted Facts and Conclusions of Law, Request for Judicial Notice, and Declarations of Natisha Carn, Lorena Abel, and J. Scott Carr filed concurrently herewith, the complete files and records in this action, and upon such other matters as the Court may allow.

Dated:  April 6, 2015                    WARGO & FRENCH LLP

                                         By:  s/ J. Scott Carr
                                              J. SCOTT CARR
                                              JEFFREY N. WILLIAMS

                                         Attorneys for Defendants TWC
                                         Administration LLC, Time Warner Cable Inc.,
                                         and Time Warner NY Cable LLC

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................ 1

II.     STATEMENT OF UNDISPUTED FACTS ............................................... 4

        A.   Undisputed Facts Relevant to the "Hours Worked" Theory ............ 4

        B.   Undisputed Facts Relevant to the "Fiscal Month" Theory.............. 5

        C.   Undisputed Facts Demonstrating That Plaintiffs' Overtime
             Calculation Theories Would Have Significantly Reduced Their
             Compensation ................................................................................. 7

        D.   Undisputed Facts Relevant to the "Piece-Rate" Theory ................ 8

III.    ARGUMENT .............................................................................................. 8

        A.   Plaintiffs' "Hours Worked" Overtime Theory is Meritless.............. 8

             1.   Plaintiffs Enjoyed a Tremendous Benefit From TWC's
                  Inclusion of PTO as "Hours Worked" When Determining
                  Overtime ................................................................................ 9

             2.   The Law Permits PTO Hours to be Included in "Hours
                  Worked" .............................................................................. 10

        B.   Plaintiffs' "Fiscal Month" Overtime Theory is Meritless ............ 12

             1.   Overtime Calculations Must Be Made On a Workweek Basis ... 13

             2.   TWC's Allocation Method Is Consistent With the Applicable
                  Regulations ......................................................................... 14

             3.   TWC's Methodology Is Reasonable and Equitable ............... 15

        C.   Plaintiffs' Overtime Theories Fail Because They were not
             Underpaid ..................................................................................... 18

        D.   Plaintiffs Lack Constitutional Standing to Pursue Their Overtime
             Theories......................................................................................... 18

        E.   Plaintiffs' "Piece-Rate" Wage Statement Theory is Meritless ............ 18

        F.   Plaintiffs May Not Use Entirely Derivative Wage Statement and
             Waiting Time Claims to Inflate Their Alleged Damages..................... 20

             1.   Plaintiffs' Derivative Wage Statement Claim Fails Because
                  Their Wage Statements Complied with Labor Code Section
                  226.................................................................................... 20

             2.   Plaintiffs' Waiting Time Claim Fails Because They Were
                  Overpaid .............................................................................. 23

             3.   Plaintiffs' Claim for Waiting Time Penalties Fails Because
                  There is a Good Faith Dispute as to Whether There Are Any
                  Unpaid Wages Owed ............................................................ 24

IV.     CONCLUSION ..........................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aaron v. City of Wichita, Kan.*,
   54 F. 3d 652 (10th Cir. 1995)............................................................................11

*Alonzo v. Maximus, Inc.*,
   832 F. Supp. 2d 1122 (C.D. Cal. 2011).......................................................8, 9

*Alvarado v. Corporate Cleaning Serv., Inc.*,
   07 C 06361, 2013 WL 6184044 (N.D. Ill. Nov. 18, 2013) .........................18, 19

*Areso v. Carmax*, 195 Cal. App. 4th 996 (2011) ....................................................18

*Barrentine v. Arkansas-Best Freight Sys., Inc.*,
   450 U.S. 728 (1981).........................................................................................10

*Bellinghausen v. Tractor Supply Co.*,
   C-13-02377 JSC, 2014 WL 465907 (N.D. Cal. Feb. 3, 2014) .........................21

*Boston v. United Florala, Inc.*,
   No. 2:14CV240-WHA, 2015 WL 1020577 (M.D. Ala. Mar. 9, 2015) .............13

*Brian Driscoll, et. al. v. Graniterock Company*,
   1-08-CV-103426, 2011 WL 10366147 (Santa Clara Cty. Sup. Ct. Sept. 20, 2011)
   .........................................................................................................................21

*Chavez v. City of Albuquerque*,
   630 F.3d 1300 (10th Cir. 2011)......................................................................13

*Gonzalez v. Downtown LA Motors, LP*,
   215 Cal. App. 4th 36 (2013)............................................................................10

*Jones v. Spherion Staffing LLC*,
   LA CV11-06462 JAK, 2012 WL 3264081 (C.D. Cal. Aug. 7, 2012) .........21, 23

*Magnoni v. Smith & Laquercia*,
   483 F. App'x 613 (2d Cir. 2012)....................................................................13

*Monzon v. Schaefer Ambulance Serv.*,
   224 Cal.App.3d 16 (1990)...............................................................................13

*Nguyen v. Baxter Healthcare Corp.*,
    8:10-CV-01436-CJC, 2011 WL 6018284 (C.D. Cal. Nov. 28, 2011) ...............21

*O'Brien v. Town of Agawam*,
    482 F. Supp. 2d 115 (D. Mass. 2007)................................................................10

*Pedroza v. PetSmart, Inc.*,
    ED CV 11-298 GHK DTB, 2012 WL 9506073 (C.D. Cal. June 14, 2012).......22

*Taylor v. West Marine Prods., Inc.*,
    No. C 13–04916 WHA, 2014 WL 4683926 (N.D. Cal. Sept. 19, 2014) ...........13

**Statutes**

29 U.S.C. § 207(a)(1)...........................................................................................12

8 Cal. Code Regs. § 13520................................................................................23, 24

Cal. Lab. Code § 203 .......................................................................................22, 23

*Cal. Lab. Code § 226* .......................................................................................20, 21

Cal. Lab. Code § 226(a) ...................................................................................18, 21

Cal. Lab. Code § 226(a)(9) ....................................................................................20

Cal. Lab. Code § 226(e)(1) ..............................................................................20, 22

Cal. Lab. Code § 226(e)(2) ....................................................................................20

**Other Authorities**

29 C.F.R. § 778.103...............................................................................................13

29 C.F.R. § 778.109.................................................................................10, 11, 13

29 C.F.R. § 778.119.................................................................................14, 15, 16

29 C.F.R. § 778.120...............................................................................................15

29 C.F.R. § 778.120(a)...........................................................................................15

29 C.F.R. § 778.209(a)-(b).....................................................................................15

29 C.F.R. § 778.218.........................................................................................10, 11

DEFS.' NTC OF MTN AND MTN FOR SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

In a classic case of "no good deed" goes unpunished, Plaintiffs' counsel have concocted novel overtime theories that seek to impose liability on TWC for paying Plaintiffs hundreds of dollars ***more*** in overtime than they would have received under the alternate calculation methodologies their counsel proposes.  Unlike the typical overtime claim, however, Plaintiffs here do not contend that TWC failed to pay them for any overtime hours they worked.  Instead, Plaintiffs argue only that TWC should have calculated the "regular rate of pay" differently on certain occasions.  As shown below, however, Plaintiffs' novel theories fail as a matter of law, as TWC's overtime calculations do not underpay employees, and the law simply does not require that employers use the alternate methodologies proposed by their counsel.

Plaintiffs' first overtime theory contends that TWC should not have counted holiday, vacation and personal hours ("paid time off" or "PTO") toward the total number of hours worked in a workweek when determining an employee's overtime pay (the "hours worked" theory).  (SAC, ¶ 20(a).)  Plaintiffs theorize that including PTO in the overtime calculation diluted their regular rate of pay and thus caused their overtime pay to be *a few pennies* less than it would have been had TWC not counted PTO as "hours worked."  Plaintiffs are wrong as a matter of both law and fact.  The applicable regulations demonstrate that counting PTO toward "hours worked" is permissible so long as the employer treats the PTO consistently—that is, as "hours worked" for all purposes of the overtime calculation—and its methodology is not designed to underpay employees.  Here, TWC's inclusion of PTO in "hours worked" is unquestionably lawful and in fact designed to ***over***pay employees, as it causes overtime premiums to be paid even when employees have not actually worked over 40 hours in a week or 8 hours in a day.  For example, in one workweek Vazquez worked 40.50 "actual" hours but also received holiday pay for an additional 8 hours, and therefore TWC deemed her to have worked 48.50 total hours (rather than 40.50

1    hours) in that week.  Thus, TWC's practice credited Vazquez with additional

2    overtime hours to which she would not otherwise have been entitled, resulting in a

3    significant overpayment to her.

4         Plaintiffs' second overtime theory contends that when Plaintiffs received

5    certain commission and scorecard payments pursuant to a fiscal month pay cycle,

6    TWC was required to use the fiscal month to recalculate the overtime due on such

7    compensation (the "fiscal month" theory).  (SAC, ¶20(b).)  Notably, unlike the

8    typical allocation case, Plaintiffs cannot argue that TWC excluded such payments

9    from the overtime rate, as it is undisputed that *every penny* of scorecard or

10   commission compensation was included in TWC's overtime calculations.  Rather,

11   Plaintiffs contend only that because the fiscal month pay cycle often did not coincide

12   exactly with TWC's defined workweeks, TWC was prohibited from allocating that

13   compensation to TWC's defined workweeks and calculating the overtime due on

14   such compensation on a workweek-by-workweek basis, but was instead required to

15   calculate such overtime over the exact hours of the commission/scorecard fiscal

16   month pay cycle.  Notably, *no court has held that an employer can abandon its*

17   *defined workweek in this manner*, *and the applicable regulations expressly endorse*

18   *allocation across workweeks, as TWC did here*.  Further, where, as here, the

19   earnings period does not precisely match the workweeks, the applicable regulations

20   require only that the employer use a "reasonable and equitable" allocation method,

21   which TWC unquestionably did.

22        The reasonableness of TWC's overtime calculations is confirmed by Plaintiffs'

23   own experiences.  Indeed, far from underpaying Plaintiffs, *TWC's methodologies*

24   *paid Joseph approximately $346.47 more than he would have received under*

25   *Plaintiffs' proposal, while Vazquez received an additional $167.20*.   There can

26   simply be no liability under the governing federal Fair Labor Standards Act

27   ("FLSA") or corresponding California law when the employee has received more in

28   wages than he was entitled.  For the same reason, Plaintiffs lack Article III

**DEFS.' NTC OF MTN AND MTN FOR SUMMARY JUDGMENT**

constitutional standing to pursue their overtime claims.  That is, because ***both Plaintiffs gained hundreds of dollars of compensation*** as a result of TWC's overtime calculations, neither Plaintiff has suffered an "injury in fact."

Plaintiffs' third claim is for alleged wage statement violations, and contends that Plaintiffs' sales commissions were actually piece-rate payments that TWC was required to specifically itemize on Plaintiffs' wage statements.  (SAC, ¶16, 21(d).)  Plaintiffs are wrong.  A "piece rate" is paid to an employee for every ***item produced or procedure completed***, while a commission rewards an employee for every product ***sold***.  Here, it is undisputed that TWC did not pay Plaintiffs, who were customer service representatives, for each customer interaction (which would have included non-sales inquiries such as billing inquiries), but instead rewarded them only for selling services to customers—a classic commission.

Finally, Plaintiffs attempt to obtain a multiple recovery on their overtime theories by tacking on derivative claims for wage statement and waiting time penalties under California law.  (SAC, ¶21(a)-(c), 23.)  These derivative claims fail at the outset because the underlying claims on which they rely fail, as set forth above.  In any event, though, even if Plaintiffs' underlying theories had any merit, their derivative wage statement and waiting time penalty claims would still fail because they cannot be premised solely on the alleged underpayment of overtime wages.  Indeed, Plaintiffs' wage statements were accurate, and their derivative claim attempts to turn the statute on its head by contending that TWC was required to provide them with ***inaccurate*** wage statements reflecting amounts they were ***not*** actually paid and ***only now*** contend they were owed.  Both derivative claims also fail on the independent ground that there is a good faith dispute as to whether TWC owes any additional overtime at all (a safe harbor inserted into the penalty statutes for this very reason—*i.e.*, to prevent the claims from being used for an unwarranted multiple recovery).  Plaintiffs' waiting time claim also fails because Plaintiffs simply were not

1  owed anything at the time of their discharge, given that TWC's overtime calculations
2  did not result in a net underpayment.

3      At its core, this is a case involving novel wage-and-hour theories which, even
4  if legally correct (they are not), did not result in any actual underpayment to
5  Plaintiffs.  Plaintiffs' counsel have merely invented these novel theories in an attempt
6  to trigger penalties and obtain a large fee award, at the expense of current and future
7  employees who would be deprived of the clear benefits of TWC's calculation
8  methodologies.  At the end of the day, however, the claims alleged in Plaintiffs' SAC
9  are wholly meritless, and TWC is entitled to summary judgment.

10               **II.    STATEMENT OF UNDISPUTED FACTS**
11  **A.   Undisputed Facts Relevant to the "Hours Worked" Theory**

12      As non-exempt California employees, Plaintiffs earned overtime premiums for
13  every hour they logged in excess of 8 in a day or 40 in a workweek.  (Statement of
14  Uncontroverted Facts & Conclusions of Law filed concurrently herewith ("SUF"),
15  ¶1.)  For purposes of "hours worked," TWC included PTO hours as well as hours in
16  which its employees were actually on-the-job.  (SUF, ¶2.)  Thus, even if Plaintiffs did
17  not actually work 8 hours in a day or 40 in a week, they could still be paid overtime
18  compensation if they took PTO that, when added to the hours they actually worked,
19  caused their total hours to exceed 8 in a day or 40 in a week.  (SUF, ¶3.)

20      Despite this obvious benefit of TWC's methodology, Plaintiffs contend that by
21  including PTO as "hours worked" TWC improperly diluted their regular rate of pay
22  and, in turn, their overtime pay.  (SAC, ¶20(a).)  Notably, however, Plaintiffs' theory
23  ignores the fact that, again, TWC's inclusion of PTO as "hours worked" caused them
24  to be paid significant amounts of overtime compensation in workweeks when they did
25  not actually work over 40 hours.  (SUF, ¶2-3.)

26      For example, during the workweek ending January 19, 2012, Vazquez worked
27  5 days and accrued 40.50 hours of on-the-job time (39.5 straight-time hours and 1
28  hour of overtime), but also received holiday pay for an additional 8 hours that she did

-4-
**DEFS.' NTC OF MTN AND MTN FOR SUMMARY JUDGMENT**

not work (on Martin Luther King Day).  (SUF, ¶4.)  Under Plaintiffs' theory—*i.e.*, that PTO should not be counted as "hours worked"—Vazquez should have been credited with 47.5 straight time hours (39.5 worked hours + 8 PTO hours) and only *one* (daily) overtime hour, but she was instead credited with 40 straight time hours and *8.5* overtime hours because she was deemed to have worked 48.50 hours (40.50 worked hours + 8 PTO hours).  (SUF, ¶5.)  Thus, Plaintiffs' theory would have required Vazquez to give up the 7.5 additional hours of overtime she was credited with *precisely because* TWC included PTO as "hours worked" in the overtime calculation.  (SUF, ¶6.)  Ultimately, for this reason, Vazquez received *over 70 dollars more* this workweek under TWC's method than under Plaintiffs' method.  (*Id.*)  In fact, as shown in Part II.C below, both Plaintiffs earned significantly more under TWC's overtime calculation practices than they would have earned under the alternate methodologies Plaintiffs' counsel have concocted.

**B.    Undisputed Facts Relevant to the "Fiscal Month" Theory**

As required by law, TWC has established a defined workweek for the purposes of calculating overtime compensation.  TWC's defined workweek runs from Friday to Thursday.  (SUF, ¶11.)  Likewise, as required by California law, TWC utilized two-week pay periods and paid Plaintiffs any overtime premiums they were owed for each workweek in each such pay period.  (SUF, ¶12.)

Plaintiffs were subject to various compensation plans, at various times, that provided them with "scorecard" and/or commission compensation in addition to their hourly wages.  (SUF, ¶13.)  For example, as a Customer Care Professional, Joseph was eligible to earn commissions "based on the dollar amount paid per installed core product [and] determined based on the total core products installed during a scorecard cycle."  (SUF, ¶14.)[2]  The "scorecard" portion of the compensation plan was likewise

---

[2] TWC utilized the word "installed" in this context to distinguish between sales made by the employee but never completed (for example, if a customer cancelled a purchase between the time of the sale and the install date such that the services were

calculated separately every pay cycle based on Joseph's score on various performance benchmarks.  (SUF, ¶15.)  The scorecard ratings directly affected Joseph's commissions, as he was eligible for higher commission rates at higher scorecard levels.  (SUF, ¶16.)  Because commissions depend on scorecard level, commissions could not be calculated, and were not due, until the end of the pay cycle when the scorecard was calculated.  (SUF, ¶17.)

Some (but not all) of these compensation plans operated on a "fiscal month" pay cycle, running from the 19th of the month to the 18th of the following month. (SUF, ¶18.)  Because the fiscal month runs from the 19th through the 18th, it does not necessarily coincide perfectly with TWC's defined workweeks (*i.e.*, Friday to Thursday).  (SUF, ¶19.)  Thus, the fiscal month can, and often does, start or end in the midst of a defined workweek.  (SUF, ¶20.)  Stated another way, a single workweek could encompass the end of one fiscal month as well as the start of the next, meaning that if TWC were to try to recalculate overtime on a fiscal month basis, there would be "outlier" workweeks (weeks that included days outside the fiscal month) that would have to be treated differently than those that fell entirely within the fiscal month.  (SUF, ¶21.)

At the end of the fiscal month, when Plaintiffs' commission and scorecard compensation was calculable, TWC recalculated and supplemented Plaintiffs' overtime payments to account for that additional compensation.  (SUF, ¶22.) However, contrary to Plaintiffs' allegation that TWC "randomly allocated" these payments to "weeks of its choosing" (SAC, ¶20(b)), TWC allocated the scorecard and commission compensation evenly across TWC's defined workweeks.  (SUF, ¶23.) When those workweeks did not coincide perfectly with the fiscal month pay cycle, TWC allocated the scorecard/commission compensation evenly across the workweeks that most closely aligned with the fiscal month.  (SUF, ¶24.)  TWC then recalculated

not ultimately installed) and completed, installed sales.  (*Id.*)  For obvious reasons, employees were only paid a commission for completed, installed sales.  (*Id.*)

1   Plaintiffs' overtime pay for each such workweek, including all of the scorecard and/or

2   commission compensation for that cycle, and paid Plaintiffs the difference between

3   the original overtime premiums and the higher, restated premiums.  (SUF, ¶25.)

4        It is undisputed that TWC allocated all of Plaintiffs' commission and scorecard

5   payments to particular workweeks in the above manner, thus ensuring that all such

6   compensation was considered in TWC's overtime calculations.  (SUF, ¶26.)  That is,

7   while Plaintiffs contend that TWC sometimes calculated overtime on their scorecard

8   and/or commission compensation over what they contend are the "wrong" periods of

9   time, they cannot argue that TWC failed to allocate any such compensation to a

10  workweek and thus failed to consider it in its overtime calculations.

11       Rather, Plaintiffs contend only that to calculate overtime on such compensation

12  over the "right" periods of time, TWC was required to take the total scorecard and

13  commission compensation for the fiscal month and then divide that amount by the

14  number of hours worked over the fiscal month and allocate that compensation to

15  those fiscal month hours.  (SUF, ¶27.)  Thus, Plaintiffs' theory would require TWC to

16  wholly abandon its defined workweek (which it is required to establish and utilize

17  under federal and state law) for purposes of paying overtime on Plaintiffs' scorecard

18  and commission compensation.  (SUF, ¶28.)

19  **C.**    **Undisputed Facts Demonstrating That Plaintiffs' Overtime Calculation**

20         **Theories Would Have Significantly Reduced Their Compensation**

21       Notably, Plaintiffs' novel attorney-driven theories, if implemented by TWC,

22  would have significantly *reduced* Plaintiffs' compensation (and that of other

23  employees).  That is, during the period from September 2, 2010 to termination,

24  Vazquez received an additional ***$167.20*** in overtime compensation pursuant to

25  TWC's overtime calculations that she would not have received if TWC had followed

26  Plaintiffs' proposed methodologies.  (SUF, ¶32.)  Joseph enjoyed an even greater

27  benefit, receiving ***$346.47*** in additional overtime compensation.  (SUF, ¶33.)

28

**D.   Undisputed Facts Relevant to the "Piece-Rate" Theory**

Plaintiffs contend that the commissions they received during their tenure with TWC were not bona-fide sales commissions, but were instead "piece-rate" payments. (SAC, ¶16, 21(d).)  It is undisputed, however, that Plaintiffs were not paid for each customer interaction or transaction.  (SUF, ¶36.)  Instead, the compensation plans make clear that these payments were awarded to Plaintiffs only when they were successful in selling products and services to customers beyond those that the customers had prior to engaging in any interaction with Plaintiffs.  (SUF, ¶37.)  As shown *infra*, such payments are unquestionably commissions, as a matter of law.

### III.   ARGUMENT

For the reasons set forth below, each of Plaintiffs' theories of relief fails as a matter of law.  Plaintiffs' novel overtime theories fail because TWC did not underpay Plaintiffs, and its calculation methodologies are consistent with both federal and California law.  Indeed, Plaintiffs have premised their claims upon federal regulations that simply do not require the sorts of calculations that Plaintiffs propose here, as shown below.  Those regulations also doom Plaintiffs' state law theories, as California law looks to federal law when determining an employee's overtime rate of pay.  *Alonzo v. Maximus, Inc.*, 832 F. Supp. 2d 1122, 1129 (C.D. Cal. 2011).  Plaintiffs' wage statement theory fails in turn because Plaintiffs received commissions, not piece-rate payments.  Finally, Plaintiffs' derivative claims fail because the underlying claims on which they are premised are meritless, and because Plaintiffs improperly seek to use their derivative claims as a vehicle for an impermissible multiple recovery on their overtime claims.

**A.   Plaintiffs' "Hours Worked" Overtime Theory is Meritless**

Plaintiffs' "hours worked" theory fails because TWC's inclusion of PTO in its overtime calculations did not underpay Plaintiffs, nor is it unlawful.

1      *1.   Plaintiffs Enjoyed a Tremendous Benefit From TWC's Inclusion of PTO as*

2           *"Hours Worked" When Determining Overtime*

3     Plaintiffs' "hours worked" theory asserts that TWC was not permitted to count

4   PTO hours as hours worked in calculating Plaintiffs' overtime hours because,

5   according to Plaintiffs, doing so diluted their regular rate of pay (and hence, their

6   overtime pay) by a few pennies in weeks when they: (1) took paid time off; (2)

7   worked overtime; ***and*** (3) received additional compensation that was factored into the

8   regular rate (*i.e.*, scorecard and commission payments).  (SAC, ¶20(a).)  They contend

9   that this "consistently caused underpayment of overtime wages."  (*Id.*)

10     However, Plaintiffs' theory fails at the outset because it is based on a faulty

11   premise; that is, the false assertion that including PTO in the hours worked

12   calculations invariably decreased the amount of overtime compensation paid to

13   Plaintiffs.  (*Id.*)  Quite the contrary, the undisputed facts demonstrate that TWC's

14   inclusion of PTO as "hours worked" greatly benefited Plaintiffs, as it resulted in the

15   payment of substantial additional overtime premiums that would have been lost under

16   Plaintiffs' theory.  The critical fact Plaintiffs ignore is that by including PTO as hours

17   "actually worked," TWC counted each PTO hour toward their overtime eligibility

18   threshold of 8 hours per day or 40 hours per week and therefore paid Plaintiffs

19   overtime premium compensation for hours that they did not actually work and to

20   which they were not legally entitled.  (SUF, ¶2-3.)

21     The resulting benefit to Plaintiffs is obvious.  For example, as indicated above,

22   during the workweek ending January 19, 2012, Vazquez worked 5 days and accrued

23   40.50 hours of on-the-job time (39.5 straight-time hours and 1 hour of overtime), but

24   also received holiday pay for an additional 8 hours that she did not work (on Martin

25   Luther King Day).  (SUF, ¶4.)  Under Plaintiffs' theory—*i.e.*, that PTO should not be

26   counted as "hours worked"—Vazquez should have been credited with 47.5 straight

27   time hours (39.5 worked hours + 8 PTO hours) and only ***one*** (daily) overtime hour,

28   but she was instead credited with 40 straight time hours and ***8.5*** overtime hours

1   because she was deemed to have worked 48.50 hours (40.50 worked hours + 8 PTO

2   hours).  (SUF, ¶5.)  Thus, Plaintiffs' theory would have required Vazquez to give up

3   the 7.5 additional hours of overtime she was credited with ***precisely because*** TWC

4   included PTO as "hours worked" in the overtime calculation.  (SUF, ¶6.)  Ultimately,

5   for this reason, Vazquez received ***over 70 dollars more*** this workweek under TWC's

6   method than under Plaintiffs' method.  (SUF, ¶7.)

7         Thus, counting PTO as "hours worked" does not decrease the compensation

8   due to employees.  To the contrary, it increases it.  In fact, if Plaintiffs were still

9   employed by TWC, the relief they seek here would actually harm them (and other

10  employees) significantly.  The negative effect on total compensation paid to TWC's

11  current and future employees that would result from a ruling in Plaintiffs' favor runs

12  directly counter to both the FLSA's and California's stated legislative intent to protect

13  and benefit employees.  *See Gonzalez v. Downtown LA Motors, LP*, 215 Cal. App. 4th

14  36, 44 (2013) (noting that wage and hour laws are to be construed in favor of

15  protecting workers); *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728,

16  739 (1981) (holding congressional purpose behind FLSA "was to protect all covered

17  workers from substandard wages").  Thus, Plaintiffs' theory must be rejected, as it

18  would work a substantial detriment to employees.

19        *2.    The Law Permits PTO Hours to be Included in "Hours Worked"*

20        Given that TWC's practice of counting PTO as hours worked for overtime

21  purposes greatly benefits employees, it is not surprising that it is also lawful.  That is,

22  while employers are not ***required*** to include PTO in calculating overtime hours

23  worked, they are permitted to do so.  Thus, the Department of Labor ("DOL")

24  regulations implementing the FLSA specifically provide:

25        Payments which are made for occasional periods when the employee
26        is not at work due to vacation, holiday, illness, failure of the employer
          to provide sufficient work, or other similar cause. . . ***may*** be excluded
27        from the regular rate of pay under section 7(e)(2) of the Act.

28

29 C.F.R. § 778.218 ("Section 778.218") (emphasis added); *see also O'Brien v. Town of Agawam*, 482 F. Supp. 2d 115, 117 (D. Mass. 2007) ("[N]othing in the FLSA prevents an employer from voluntarily adding non-work pay to the regular rate").

Plaintiffs entirely ignore this regulation.  Indeed, despite the ***permissive*** language of Section 778.218, Plaintiffs argue that an employer ***must always*** exclude PTO from the regular rate calculation.  As support for that erroneous argument, Plaintiffs' SAC relies upon 29 C.F.R. § 778.109, which states that:

> The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek [*i.e.*, the "dividend" of the regular rate calculation] by the total number of hours actually worked by him in that workweek for which such compensation was paid [the "divisor"].

29 C.F.R. § 778.109 ("Section 778.109").

Plaintiffs' theory fails as a matter of law, as they read Section 778.109 in isolation and out of context.  Indeed, Plaintiffs' construction is nonsensical, as they construe this regulation to mean that an employer can ***never*** include PTO in "hours actually worked," even where, as here, they include PTO in the "total remuneration" portion of the calculation (and when determining total hours worked in a day or week).  Mandating such inconsistent treatment of PTO hours is neither the letter nor the intent of Section 778.109.  Rather, when read in conjunction with Section 778.218—which specifically ***permits, but does not require***, TWC to exclude PTO from "total remuneration"—it is clear that the intent of Section 778.109 was only to prohibit an employer from including PTO in "hours actually worked" ***in the event that*** the employer has elected to exclude PTO from "total remuneration" under Section 778.218.   That is, were it not for Section 778.109, an employer could unfairly dilute an employee's regular rate of pay by utilizing the Section 778.218 statutory exclusion to exclude PTO payments from "total remuneration" yet, at the same time, include PTO hours in "hours actually worked."  It is ***this*** abuse that Section 778.109

1  seeks to prevent, not the consistent, fair and highly beneficial treatment of PTO as

2  "hours worked" that TWC has implemented.

3     Indeed, in this case it is undisputed that TWC did not manipulate PTO hours to

4  dilute Plaintiffs' overtime pay in violation of Section 778.109.   TWC did not avail

5  itself of the Section 778.218 statutory exclusion, as it could have, but instead counted

6  PTO as "hours actually worked" for all purposes of its overtime and regular rate

7  calculations, including in calculating ***both*** "total remuneration" and total hours

8  worked.  Thus, because Plaintiffs received credit for PTO as "hours actually worked"

9  towards overtime, as well as in the remuneration portion of the Section 778.109

10  calculation, TWC also properly treated PTO as "hours actually worked" in that same

11  calculation.  This was entirely lawful.  *See Aaron v. City of Wichita, Kan.*, 54 F. 3d

12  652, 656 (10th Cir. 1995) (rejecting employees' argument that certain paid days off

13  "should not have been included in the divisor [*i.e.*, in "hours actually worked"] for

14  purposes of calculating the regular rate").

15     In sum, Plaintiffs' "hours worked" theory of excluding PTO from "hours

16  worked" for all purposes is the ultimate example of an attorney-driven claim that, if

17  successful, would line counsel's pockets while resulting in a significant loss in

18  compensation to employees.  As shown above, Plaintiffs' theory is erroneous, and

19  summary judgment for TWC is therefore appropriate.

20  **B.**   **Plaintiffs' "Fiscal Month" Overtime Theory is Meritless**

21     Again, there is no dispute that TWC included every penny of Plaintiffs'

22  scorecard and commission payments in their overtime calculations.  Nonetheless,

23  Plaintiffs contend that TWC violated the law by allocating those payments across its

24  defined workweeks and then calculating the overtime due on that compensation on a

25  workweek-by-workweek basis.  Specifically, Plaintiffs' counsel contend that when

26  Plaintiffs earned scorecard and commission compensation on a "fiscal month" basis

27  (*i.e.*, from the 19th of one month to the 18th of the following month), and that fiscal

28  month did not perfectly match TWC's defined workweeks, TWC was required to

1  allocate that compensation back over the exact hours of the "fiscal month" pay cycle

2  and calculate the overtime due on a fiscal month, rather than workweek, basis.  (SAC,

3  ¶20(b), SUF, ¶26-27.)  That theory fails as a matter of law because: (1) overtime must

4  be calculated on a defined workweek basis; (2) TWC's allocation by workweeks is

5  exactly what the applicable regulations contemplate; and (3) TWC's method is

6  obviously equitable and just.

7        *1.   Overtime Calculations Must Be Made On a Workweek Basis*

8       As explained above, TWC—like every other employer—has established a

9  defined workweek for purposes of calculating overtime owed to its employees.  There

10  is simply no question that, under both state and federal law, employers are required to

11  establish a defined workweek and then calculate and pay overtime compensation on a

12  workweek-by-workweek basis.  *See, e.g.,* 29 U.S.C. § 207(a)(1) ["Section 7(a)"]

13  ("[N]o employer shall employ any of his employees who in any ***workweek*** is engaged

14  in commerce … for a ***workweek*** longer than forty hours unless such employee

15  receives compensation for his employment in excess of the hours above specified at a

16  rate not less than one and one-half times the regular rate at which he is employed");

17  29 C.F.R. § 778.103 ("The ***workweek*** as the basis for applying [S]ection 7(a)"); 29

18  C.F.R. § 778.109 ("[I]t is necessary to compute the regular hourly rate of such

19  employees during each ***workweek***"); *Magnoni v. Smith & Laquercia*, 483 F. App'x

20  613, 615 (2d Cir. 2012) (rejecting plaintiff's argument as "[s]he persistently

21  calculated her overtime on a daily basis, rather than on the basis of a 40–hour

22  ***workweek*** as required by the statute"); *Chavez v. City of Albuquerque*, 630 F.3d 1300,

23  1304-05 (10th Cir. 2011) ("The regular rate is the hourly rate actually paid for the

24  normal, non-overtime ***workweek***"); *Boston v. United Florala, Inc.*, No. 2:14CV240-

25  WHA, 2015 WL 1020577, at *1 fn. 1 (M.D. Ala. Mar. 9, 2015) (noting "general

26  requirement of section 7(a) that overtime compensation be computed on a ***workweek***

27  basis"); DLSE Manual (*see* Defendants' concurrently-filed Request for Judicial

28  Notice ("RJN"), Ex. A), at § 49.2.1.2 ("Compute the regular rate by dividing the total

**DEFS.' NTC OF MTN AND MTN FOR SUMMARY JUDGMENT**

1   earnings for the *week*, including earnings during overtime hours, by the total hours

2   worked during the *week*, including the overtime hours"); *Taylor v. West Marine*

3   *Prods., Inc.*, No. C 13–04916 WHA, 2014 WL 4683926, at *5 (N.D. Cal. Sept. 19,

4   2014) (defining "regular rate of pay" as "total remuneration in a *workweek* divided by

5   the total number of hours actually worked in that *workweek*); *Monzon v. Schaefer*

6   *Ambulance Serv.*, 224 Cal.App.3d 16, 22 (1990) ("[T]he proper method to use in

7   calculating overtime is one in which the employer must identify at *week's end* all

8   hours worked by an employee during that *workweek* and pay overtime based upon the

9   excess of total hours over the greater of either: (1) eight hours in a workday, including

10  double time, or (2) forty hours in a *workweek*") (emphasis added).

11      Here, the novel theory concocted by Plaintiffs' counsel demands that TWC

12  abandon the defined workweek and instead calculate overtime due on the commission

13  and scorecard compensation on a fiscal month basis.  As shown above, that theory is

14  entirely inconsistent with the fundamental premise and requirement of state and

15  federal law that overtime be calculated on the basis of the employer's defined

16  workweek.  Accordingly, Plaintiffs' theory fails as a matter of law on this basis alone.

17      *2.   TWC's Allocation Method Is Consistent With the Applicable Regulations*

18      Furthermore, even if the Court were to entertain Plaintiffs' novel (erroneous)

19  theory that TWC could be required, or even permitted, to calculate overtime on

20  something other than a workweek-by-workweek basis, the theory would still fail

21  because TWC's allocation and calculation methodologies are entirely consistent with

22  the applicable regulations.  Indeed, ***the plain language of the DOL regulation upon***

23  ***which Plaintiffs' theory relies—29 C.F.R. § 778.119[3]—actually supports TWC's***

24  ***allocation and calculation by workweek, rather than Plaintiffs' proposed***

25  ***methodology***.  That regulation states:

26      When the commission can be computed and paid, additional overtime
        compensation due by reason of the inclusion of the commission in the
27

28  _____
    [3] *See* SAC, ¶20(b).

employee's regular rate must also be paid. To compute this additional overtime compensation, it is necessary, as a general rule, that the commission be ***apportioned back over the <u>workweeks</u>*** of the period during which it was earned.

29 C.F.R. § 778.119 (emphasis added).

Thus, Plaintiffs' theory is specious. The entire basis of their theory is that, rather than allocating scorecard and commission compensation back to certain ***workweeks***—as contemplated by the very regulation upon which they rely—TWC was required to allocate said compensation back over specific ***hours*** of the "fiscal month" period. (SUF, ¶26-27.) However, the plain language of the regulation simply does not support that argument.

Moreover, Plaintiffs (again) read this regulation out of context with the surrounding regulations. In fact, the very next regulation provides that:

If it is not possible or practicable to allocate the commission among the ***workweeks*** of the period in proportion to the amount of commission actually earned or reasonably presumed to be earned each week, ***some other reasonable and equitable method must be adopted***.

29 C.F.R. § 778.120 (emphasis added).[4] ***The regulation then goes on to endorse the very method of allocation TWC utilized, that is, summing scorecard and commission payments over the period earned and then dividing them equally among the workweeks of the corresponding pay period***. *See* 29 C.F.R. § 778.120(a) ("Allocation of equal amounts to each week"). Thus, not only is there no authority barring TWC's workweek methodology, that methodology is expressly endorsed by DOL regulations.

### 3. *TWC's Methodology Is Reasonable and Equitable*

Finally, there is no question that TWC's methodology meets the "reasonable and equitable" standard of 29 C.F.R. § 778.120. First, given that both state and

---

[4] There are an analogous set of regulations that apply to the reallocation of scorecard compensation. *See* 29 C.F.R. § 778.209(a)-(b).

1   federal law generally require employers to calculate compensation based on defined

2   workweeks, it was entirely reasonable for TWC do so here.

3       Second, TWC's apportionment over the most closely aligned workweeks was

4   also eminently reasonable given that 29 C.F.R. § 778.119 expressly contemplates

5   apportionment of commissions across workweeks, as shown above.

6       Third, Plaintiffs' own experiences show that TWC's methodology is reasonable

7   and equitable, as that methodology is not calculated to underpay employees, nor does

8   it weigh the scales against its employees.  Rather, whether an employee gains, loses

9   or breaks even under *either* methodology turns upon whether the employee worked

10  more overtime in the workweeks to which TWC allocated the compensation, or

11  instead during the "outlier" days of the fiscal month period that Plaintiffs would use.

12  Thus, again, it is clear that TWC's methodology—which tracks the language and

13  intent of the applicable regulations—was "reasonable and equitable."

14      Finally, the administrative feasibility of TWC's methodology, and the

15  corresponding ***in***feasibility of Plaintiffs' proposal, also compels the conclusion that

16  TWC's workweek methodology was not only reasonable and equitable, but necessary.

17  TWC, like every other employer, is required to calculate regular overtime pay on a

18  workweek-by-workweek basis.  If TWC were forced to begin recalculating overtime

19  attributable to scorecard and commission payments on a fiscal month basis, it would

20  face enormous difficulties in trying to harmonize that system with the requirement

21  that it calculate and pay other compensation—including the original overtime due to

22  employees— on a workweek-by-workweek basis.  This difficulty is recognized in

23  Section 778.119 itself, which requires that while the employer is waiting to total and

24  reallocate the commission compensation earned, it must pay normal overtime

25  "exclusive of the commission," and later calculate the additional compensation owed

26  as a result of the restated overtime rate that includes commission.  29 C.F.R. §

27  778.119.  Yet if normal overtime (one and one-half times the straight time rate) is

28  calculated on a workweek-by-workweek basis (as it must be), and restated overtime

1  (inclusive of commission) was calculated and paid on a fiscal month basis, as

2  Plaintiffs demand, there would be no way to compare the two figures to determine

3  how much additional overtime is owed.  (SUF, ¶21-25.)  That is, the recalculated

4  overtime premiums could never be matched to the corresponding original premiums

5  because the calculations would not be based on the same hours worked.  (*Id.*)

6       Another example of the infeasibility of Plaintiffs' theory is demonstrated when

7  one attempts to actually apply Plaintiffs' theory to recalculate overtime wages in a

8  situation where a workweek is split between two fiscal months and there is weekly

9  overtime in that workweek.  That is, if weekly overtime is worked in a workweek that

10 falls across two separate fiscal months, Plaintiffs' fiscal month calculation would only

11 apply to a portion of the workweek, leaving no accurate way to account for this

12 weekly overtime.[5]  (Declaration of J. Scott Carr filed concurrently herewith ("Carr

13 Decl."), ¶ 6.)  Thus, these circumstances show not only that TWC's methodology is

14 reasonable and equitable, but also that Plaintiffs' novel theory is infeasible to apply.

15 In short, TWC's workweek methodology is precisely what the law contemplates, as

16 well as reasonable and equitable.  On the other hand, Plaintiffs' novel, *ad hoc* "fiscal

17 month" proposal is not supported by law, much less mandated by it.  Thus, Plaintiffs'

18 "fiscal month" theory fails as a matter of law.

19

20 _____

21 [5] In attempting to apply Plaintiffs' fiscal month theory so as to compare it to
   Plaintiffs' actual pay (and trying to account for all overtime hours worked by

22 Plaintiff), TWC elected to take the weekly overtime earned in a workweek that fell
   within two different fiscal months and apply it all to one fiscal month, such that the

23 weekly overtime worked in that workweek was counted in Plaintiffs' fiscal month

24 theory.  However, to do so, TWC had to ignore the fact that it was applying Plaintiffs'
   fiscal month calculation to days in a workweek that fell outside a given fiscal month,

25 thus crediting Plaintiffs with overtime pay that they were not actually entitled to

26 under their theory.  Had TWC applied Plaintiffs' theory for that workweek, ***no
   overtime hours could be credited*** as the two parts of the workweek fell in different

27 fiscal months, Plaintiffs would not have worked over 40 hours in either part of that

28 workweek, and those overtime hours could not have been credited.  (Carr Decl., ¶ 6.)

**C.      Plaintiffs' Overtime Theories Fail Because They were not Underpaid**

Of course, Plaintiffs' novel overtime claims fail not only because TWC's overtime calculation methodologies are consistent with both the plain language and spirit of the law (*see supra* Parts III.A and III.B), but also because they simply were not underpaid.  Indeed, as shown above, the undisputed facts demonstrate that TWC's challenged methodologies resulted in both Plaintiffs being paid vastly more than they would have been pursuant to Plaintiffs' proposed methodologies of excluding paid time off from "hours worked" and of calculating overtime owed on scorecard and commission on a fiscal month basis.   In total, during the relevant time period, Vazquez received ***$167.20*** in overtime compensation she would not have received under Plaintiffs' theories, while Joseph enjoyed an even greater benefit, receiving ***$346.47*** in additional overtime.  (SUF, ¶32-33.)  Because no liability lies under either the FLSA or California law when there has been no underpayment, Plaintiffs' theories fail.  *See Am. Fed. of Govt. Employees, Local 3721 v. District of Columbia,* 715 F. Supp. 391, 392 (D.D.C. 1989) (finding no liability where employer "has, in fact, paid overtime compensation equal to or greater than the federally-required minimum amount"); *Alonzo*, 832 F. Supp. 2d at 1129.

**D.   Plaintiffs Lack Constitutional Standing to Pursue Their Overtime Theories**

For the same reason—*i.e.*, that Plaintiffs were paid vastly more under TWC's overtime methodologies than under their own proposed methodologies (SUF, ¶32-33)—Plaintiffs have suffered no "injury in fact" sufficient to confer Article III constitutional standing to pursue either of their overtime theories against TWC. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014).

**E.   Plaintiffs' "Piece-Rate" Wage Statement Theory is Meritless**

The essence of Plaintiffs' "piece-rate" theory is that TWC provided wage statements that failed to itemize each and every sale for which Plaintiffs earned a commission payment, as such payments should have been characterized as piece-rate payments.  (SAC, ¶16, 21(d).)  This theory can be easily disposed of, however, as the

1   law is clear that the payments were bona-fide sales commissions, not piece-rate

2   payments, and California law requires that a wage statement provide such detail only

3   "if the employee is paid on a piece-rate basis."  Cal. Lab. Code § 226(a).

4       Indeed, a commission rewards employees for each product they *sell* to a

5   customer (how Plaintiffs were paid), while a piece-rate payment rewards employees

6   for each item they *create* or each job they *complete* (not how Plaintiffs were paid).

7   (DLSE Manual (RJN, Ex. A) at §§ 2.5.1-2.5.2, 2.5.4.)  Nonetheless, Plaintiffs

8   apparently (and incorrectly) contend that TWC's commission payments to Plaintiffs

9   were based on uniform dollar amounts, and therefore were not actually commissions,

10  but were instead "piece-rate" payments.  (SAC, ¶16.)  Not so.

11      In *Areso v. Carmax* ("*Areso*"), the California Court of Appeal expressly

12  rejected the argument Plaintiffs make here, holding that a payment system which

13  compensated car salesmen with "a uniform dollar amount per vehicle" sold was a

14  commission system, not a piece-rate system.  195 Cal. App. 4th 996, 1007, 1008-09

15  (2011).  Likewise, in *Alvarado v. Corporate Cleaning Serv., Inc.*, 07 C 06361, 2013

16  WL 6184044 (N.D. Ill. Nov. 18, 2013), the court made the following observation:

17      [A]t the highest level of abstraction, the same event appears to trigger
        payments to employees under both [commission and piece-rate]
18      systems: completion of the employee's assigned task.  [For example,]
        a quilt maker gets paid when the quilter completes a quilt, and a real
19      estate broker is paid every time the broker sells a house.  Yet one is
        piecework and the other a commission. ... *[T]he essence of a*
20      *commission is that it bases compensation on sales and decouples*
        *worker pay from actual time worked.  In contrast, although a*
21      *pieceworker's pay is also decoupled from actual time worked, a*
        *piece-rate system does not directly depend on sales*.
22

23  *Id.* at *6 (emphasis added).

24      Here, it is undisputed that Plaintiffs received "commissions" only when they

25  sold a product or service to a customer beyond those the customer had before

26  interacting with Plaintiffs.  (SUF, ¶36-37.)  It is equally undisputed that Plaintiffs

27  were *not* paid per customer service interaction they completed.  (*Id.*)  Because an

28  employee compensated for every sale he makes is paid on commission, not on a

1  piece-rate basis—and it makes no difference if the amount of the commission was

2  based on a uniform dollar amount per sale, *see Areso*—Plaintiffs did not receive

3  piece-rate payments and their wage statement claim fails.

4  **F.    Plaintiffs May Not Use Entirely Derivative Wage Statement and Waiting**

5        **Time Claims to Inflate Their Alleged Damages**

6        Finally, in an attempt to inflate the damages alleged on their overtime theories,

7  Plaintiffs also allege that TWC's purported overtime miscalculations give rise to

8  derivative claims for wage statement and waiting time penalties under California law.

9  (SAC, ¶21(a)-(c), 23.)  Of course, as set forth above, these derivative claims fail at the

10 outset because the underlying claims on which they depend fail.  (*See supra* Parts

11 III.A-D.)   Regardless, these claims also fail for the additional reasons that: (1)

12 Plaintiffs' wage statements were accurate, caused no injury to Plaintiffs and were not

13 the product of any "knowing and intentional" violation of the statute; (2) Plaintiffs

14 were not owed additional monies at discharge, and thus have no waiting time claim;

15 and (3) there is a good faith dispute as to whether the wages at the heart of these

16 theories were owed.  In fact, as shown below, Plaintiffs do not even invoke these

17 statutes for their intended purposes, but instead seek to use them to obtain an

18 impermissible multiple recovery on their claims for unpaid overtime wages.

19      *1.    Plaintiffs' Derivative Wage Statement Claim Fails Because Their Wage*

20           *Statements Complied with Labor Code Section 226*

21      California Labor Code section 226 requires employers to furnish employees with

22 wage statements showing "all applicable hourly rates in effect during the pay period

23 and the corresponding number of hours worked at each hourly rate by the employee."

24 Cal. Lab. Code § 226(a)(9).  An employee is entitled to recover statutory damages

25 when, "as a result of a knowing and intentional failure" to furnish such a wage

26 statement, the employee "suffer[s] injury."  Cal. Lab. Code § 226(e)(1).  An employee

27 suffers injury when: (1) "the employer fails to provide accurate and complete

28 information as required;" ***and, as a result***, (2) "the employee cannot promptly and

1   easily determine from the wage statement [either] [t]he amount of the gross wages or
2   net wages paid to the employee during the pay period or any of the other information
3   required to be provided on the itemized wage statement." Cal. Lab. Code § 226(e)(2).
4       Here, Plaintiffs' derivative wage statement claim fails at the very threshold
5   because their wage statements were accurate; that is, it is undisputed that Plaintiffs'
6   wage statements accurately reflected what (and how) Plaintiffs were actually paid.
7   Indeed, Plaintiffs do not contend that the wage statements failed to accurately report
8   their actual compensation, but instead that their wage statements were required to
9   display the overtime rate and wages they now claim they ***should have*** received (under
10  their two overtime theories).  (SAC, ¶21(a).)  Thus, Plaintiffs contend, literally, that to
11  comply with a statute mandating ***accurate*** wage statements, TWC was required to
12  provide ***inaccurate*** wage statements.  That argument is obviously untenable, and must
13  be rejected.  Indeed, the flaw in Plaintiffs' argument is apparent from a plain reading
14  of the statute.  That is, any purported failure by TWC to list the overtime rate and
15  wages they claim they ***should have*** received (but did not receive) could not have
16  injured them by causing them to be unable to "promptly and easily" determine the
17  rate or wages they did receive and which were correctly listed on the wage statement.
18  Cal. Lab. Code § 226(e)(2).  Plaintiffs' Section 226 claim fails on that basis, as well.
19      Plaintiffs' theory is also antithetical to the clear purpose of the statute, as "the
20  legislative history shows that the purpose of Section 226 was for transparency, not for
21  double recovery." *Jones v. Spherion Staffing LLC*, LA CV11-06462 JAK, 2012 WL
22  3264081, at *9 (C.D. Cal. Aug. 7, 2012); *see also Nguyen v. Baxter Healthcare
23  Corp.*, 8:10-CV-01436-CJC, 2011 WL 6018284, at *8 (C.D. Cal. Nov. 28, 2011)
24
25
26
27
28

1    (same).[6]  There is no question that Plaintiffs impermissibly invoke Section 226 as a

2    scheme for multiple recovery on their underlying unpaid overtime claims, ***not*** to

3    remedy any actual inaccuracy in their wage statements.  Indeed, Plaintiffs' argument

4    would automatically convert a small claim for unpaid wages into one worth ***hundreds***

5    ***or thousands of times*** as much simply by bootstrapping an entirely derivative claim

6    for wage statement penalties (or for waiting time penalties, as discussed below).  *See*

7    *Jones,* 2012 WL 3264081, at *9 (providing example where purported underpayment

8    of $10 would result in a total minimum liability exceeding $2,500 when including

9    derivative wage statement and waiting time penalties, and rejecting the idea that such

10   a penalty was intended to apply to a purported underpayment).  As the *Jones* and

11   *Nguyen* courts observed, there is no support in the legislative history of Section 226

12   for this audacious assertion.  Section 226 was intended to deter employers from

13   providing employees with threadbare wage statements that do not properly inform

14   them as to how they were being paid.  *Id.*  It was not—nor could it be—intended to

15   deter employers from underpaying their employees in the first instance, which is what

16   Plaintiffs necessarily contend by arguing that TWC's alleged underpayment of

17   overtime premiums automatically triggers wage statement penalties.

18          Lastly, even if Plaintiffs could establish that TWC's alleged overtime

19   miscalculations could somehow give rise to a bootstrapped wage statement claim,

---

20   [6] The state court opinion referenced by the *Jones* and *Nguyen* courts analyzed Section

21   226's legislative materials and found that "§ 226(a) is intended to ensure that
     employers provide accurate itemized wage statements to employees, ***not*** to govern

22   employers' obligations with respect to meal periods."  *Brian Driscoll, et. al. v.*

23   *Graniterock Company*, 1-08-CV-103426, 2011 WL 10366147 (Santa Clara Cty. Sup.
     Ct. Sept. 20, 2011) (emphasis added).  Although the alleged underpayment in this

24   case is not related to meal periods, the analysis is equally applicable as there is
     likewise no suggestion here that Section 226 was intended to govern employers'

25   obligations with respect to overtime wages.  While a small number of district courts

26   have declined to follow *Jones* and *Nguyen* on this issue, none engage in any reasoned
     analysis of the legislative history of Section 226 (as did the *Driscoll* court) and are

27   unpersuasive for that reason.  *See, e.g.*, *Bellinghausen v. Tractor Supply Co.*, C-13-
     02377 JSC, 2014 WL 465907, at *8 (N.D. Cal. Feb. 3, 2014) (noting no cases cited

28   by plaintiff in favor of derivative wage statement claim engaged in any such analysis).

1    Plaintiffs still cannot prevail because they cannot show that TWC's purported conduct

2    was "knowing and intentional." Cal. Lab. Code § 226(e)(1). "The good faith defense

3    to the willfulness element of [a wage statement claim] is clearly established under

4    California law." *Pedroza v. PetSmart, Inc.*, ED CV 11-298 GHK DTB, 2012 WL

5    9506073, at *4-5 (C.D. Cal. June 14, 2012) (citing Section 226(e)). As shown above,

6    TWC's alleged overtime methodologies directly benefited Plaintiffs, and at least one

7    method proposed by Plaintiffs is administratively infeasible. Clearly, then, TWC's

8    alleged methodologies were implemented in good faith, and Plaintiffs have produced

9    no evidence to the contrary. Moreover, TWC has presented legitimate legal defenses

10   to Plaintiff's novel theories, which is in and of itself fatal to the "knowing and

11   intentional" element of the wage statement claim, even if the Court ultimately rejects

12   the defenses. *See Pedroza*, 2012 WL 9506073, at *4-5 (rejecting employer's

13   overtime defense but nevertheless dismissing plaintiff's wage statement claim on

14   ground that defense was at least "reasonable [and] supported by evidence").

15   Accordingly, Plaintiffs' derivative claim for inaccurate wage statements fails.

16        2.   *Plaintiffs' Waiting Time Claim Fails Because They Were Overpaid*

17        Plaintiffs also attempt to assert a derivative claim for waiting time penalties

18   under California Labor Code sections 203. That statute provides that if an employer

19   "willfully fails to pay" all wages owed at the time of discharge, "the wages of the

20   employee shall continue as a penalty from the due date thereof at the same rate until

21   paid or until an action therefor is commenced; but the wages shall not continue for

22   more than 30 days." Cal. Lab. Code § 203.

23        Here, there is no dispute that Plaintiffs were paid their final wages immediately

24   upon their termination from TWC. Rather, Plaintiffs contend only that because TWC

25   purportedly underpaid them for pennies' worth of overtime at various times during

26   the course of their employment, those pennies remained due and owing at the time of

27   their termination. (SAC, ¶23.) Thus, like their derivative wage statement claim,

28   Plaintiffs' Section 203 claim seeks an impermissible multiple recovery on their claims

1   for unpaid overtime.  *See Jones*, 2012 WL 3264081 at *9 (entering judgment for

2   defendant on both derivative wage statement and waiting time claims as they "would

3   result in an improper, multiple recovery by the employee").  Accordingly, Plaintiffs'

4   claim for waiting time penalties should be rejected on that basis alone.

5        In any event, Plaintiffs' waiting time claim also fails for the obvious reason

6   that, notwithstanding Plaintiffs' novel theories, it is undisputed that Plaintiffs had not

7   suffered any underpayment at the time of their discharge.  That is, as shown above,

8   TWC's counting of PTO time towards hours worked for purposes of overtime

9   compensation paid Plaintiffs hundreds of dollars more in overtime compensation than

10  required by law—amounts that dwarf the pennies in underpayments that Plaintiffs

11  claim under their novel, attorney-invented theories.  Thus, because undisputed facts

12  show that TWC could not have owed Plaintiffs any additional compensation at the

13  time of their discharge, their Section 203 claim fails as a matter of law.

14       *3.    Plaintiffs' Claim for Waiting Time Penalties Fails Because There is a Good*

15            *Faith Dispute as to Whether There Are Any Unpaid Wages Owed*

16       Finally, like their derivative wage statement claim, the waiting time claim also

17  fails because "a ***good faith dispute*** that any wages are due will preclude imposition of

18  waiting time penalties under Section 203."  8 Cal. Code Regs. § 13520 (emphasis

19  added).  A "good faith dispute ... occurs when an employer presents a defense, based

20  in law or fact which, if successful, would preclude any recovery on the part of the

21  employee."  *Id.*  "The fact that a defense is ultimately unsuccessful will not preclude a

22  finding that a good faith dispute did exist."  *Id.*  Here, as set forth above (*see supra*

23  Parts III.A-C), TWC has a legitimate, good faith defense to the payment of the

24  overtime wages to which Plaintiffs allege they are entitled.  Assuming the Court

25  agrees with TWC's defense, the question of whether to award waiting time penalties

26  is of course moot.  However, even if the Court does not agree, it is clear there is a

27  "good faith dispute" as to whether those wages were owed, especially given the

28  novelty of the overtime theories upon which Plaintiffs rely.  Indeed, TWC's practice

1  was borne out of a genuine desire to compensate its employees, not merely in

2  compliance with the FLSA and California law, but *in excess of* those requirements.

3  Further, Plaintiffs have not identified any case in which TWC's alleged overtime

4  calculations were found to be unlawful.  Rather, the case law, as well as the statutory

5  and regulatory authority, supports TWC's calculations.  These facts show, as a matter

6  of law, a "good faith dispute" that precludes the imposition of waiting time penalties.

7  8 Cal. Code Regs. § 13520.

8      In sum, if Plaintiffs' derivative claims were validated by the Court, there would

9  be no possible way for an employer to comply with the wage statement and waiting

10  time penalty statutes if it were ever found to have underpaid an employee, even by a

11  miniscule amount, even if the employer had calculated the employee's wages with a

12  good faith belief that it was complying with the law and even if it had issued wage

13  statements that accurately reflected the amounts paid to the employee.  As discussed

14  above, not only would such a ruling fly in the face of the plain language of the

15  statutes,  the Court would have to affirmatively find that these statutes were intended

16  to act as a deterrent to an employer's underpayment of wages.  Not only is there is no

17  such indication in the statutes or the controlling case law, the indication is to the

18  contrary.  Accordingly, these derivative claims fail as a matter of law.

19              **IV.   CONCLUSION**

20      For the foregoing reasons, summary judgment must be entered for Defendants

21  on each of Plaintiffs' claims.

22

23  Dated:  April 6, 2015              WARGO & FRENCH LLP

24

25                        By:   s/ J. Scott Carr
                               J. SCOTT CARR
26                             JEFFREY N. WILLIAMS

27                        Attorneys for Defendants

28